# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **JACKIE BARNETT-WAGGONER,** )<br>)<br>    **Plaintiff,** )<br>)<br>**v.** )<br>)<br>)<br>**SOCIAL SECURITY ADMINISTRATION,** )<br>)<br>    **Defendant.** ) | **No. 3:18-cv-00366**<br>**Judge Trauger**<br>**Magistrate Judge Brown** |

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

Pending before the court is Plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which Defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 14). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given herein, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff, Jackie Barnett-Waggoner, filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on March 19, 2013, originally alleging disability onset as of January 18, 2013, due to diabetes, depression, incontinence, non-functioning pancreas, scoliosis, hypertension, degenerative disc disease, osteoarthritis, neuropathy, and auto immune

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

deficiency. (Tr. 10, 80-81, 94, 175, 183, 187).[2] Plaintiff's claim was denied at the initial level on January 30, 2015, and on reconsideration on June 17, 2015. (Tr. 111-13, 119-20). Plaintiff subsequently requested *de novo* review of her case by an administrative law judge ("ALJ"). (Tr. 124-28). The ALJ heard the case on October 13, 2016, when Plaintiff appeared with counsel and gave testimony. (Tr. 10, 33-54). Testimony was also received by a vocational expert. (Tr. 55-62). At the conclusion of the hearing, the matter was taken under advisement until March 14, 2017, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 10-22). That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 18, 2013 through her date last insured of December 31, 2014 (20 CFR 404.1571 *et seq.*).[3]

3. Through the date last insured, the claimant had the following severe impairments: diabetes mellitus; osteoarthritis; sciatica; depression; hypertension; anemia; coronary artery disease of native vessel; and chronic diastolic heart failure (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one

---

[2]Plaintiff previously applied for Title II DIB that was denied by the ALJ on January 18, 2013. (Tr. 67-74). As a result, Plaintiff later amended the alleged onset date as to January 19, 2013. (Tr. 232, 173).

[3]For insured status, an individual must have 20 quarters of coverage in a 40-quarter period ending with the first quarter of disability. *See* 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. § 404.130. Plaintiff's insured status expired on December 31, 2014. (Tr. 13, 161.) For Title II benefits, a claimant must prove that she was disabled prior to the expiration of her insured status. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). When a claimant loses insured status, the claimant is no longer eligible for benefits for a disability arising thereafter. *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir. 1995) ("When one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter.").

2

of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) that was limited to lifting and carrying a total of no more than ten pounds both occasionally and frequently; standing and/or walking for no more than four hours in an eight-hour workday; sitting for a total of six hours in an eight-hour workday; occasional pushing and/or pulling of foot controls or foot pedals with the bilateral lower extremities; occasional balancing and climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to temperature extremes, working at unprotected heights, operating moving machinery, and driving motor vehicles. Mentally, the claimant had no limitations with regard to understanding, remembering, and carrying out job tasks. However, she could maintain adequate concentration, persistence, and pace on job tasks for only two hours at a time during an eight-hour work day although she might have had some infrequent interruptions due to psychiatric symptoms. She had no limitations to social interaction in the work environment and no limitations in adapting to changes in the work environment.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 18, 1970, and was 44 years old, which is defined as a younger individual age 18-44, on the date last insured. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

> 11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 18, 2013, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 12, 13, 15, 20-21, 22).

On March 6, 2018, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

> In the previous hearing decision, the claimant was found to have the severe impairments of diabetes mellitus, osteoarthritis, sciatica, major depressive disorder, and alcohol abuse. Exhibit B1A. For the period in question, records from Dr. Ken Berry of The Berry Clinic dated from February 11, 2013, through December 30, 2014, show that the claimant had consistently normal examinations with findings of normal strength, normal gait, intact sensation, and normal mood and affect despite her complaints of nerve pain, uncontrolled diabetes mellitus, back pain, fatigue, and headaches. She had some elevated blood pressure readings but otherwise normal cardiovascular examinations. Exhibit B13F. Of note, the claimant was diagnosed with uncontrolled diabetes mellitus, and lab work from The Berry Clinic performed between February 11, 2013, and January 16, 2014, showed consistently elevated glycated hemoglobin, or AlC, levels ranging from 7.9% to 8.1%. Exhibit B12F. The claimant also complained of severe neck pain on December 4, 2014, but she had a normal cervical MRI on December 15, 2014. Exhibit B13F.
>
> On May 23, 2014, while undergoing treatment at Vanderbilt Heart, the claimant reported having a history of ketoacidosis with symptoms of hyperglycemia, nausea, vomiting, urinary frequency, and pain. She stated that her last episode of ketoacidosis had occurred three months prior and that she usually managed her episodes at home. She also reported having chronic neuropathy in her feet and episodes of hypoglycemia once or twice a week and severe hypoglycemic episodes three or four times a year. On examination, she had diminished vibratory sensation in the toes of both feet but no foot ulcers. Exhibit B7F.
>
> The following month on June 2, 2014, the claimant presented to endocrinology clinic at Vanderbilt University Medical Center. It was noted that there was evidence that her glucose levels were fair on her current medication doses and that the highs and lows in her glucose levels would improve with counting of carbohydrates and correct use of her insulin pump features, like the Bolus Wizard. The claimant's insulin pump

4

was set up with the Bolus Wizard feature, and she was given an AlC goal of 7.5%. Exhibit B7F.

Lab work from The Berry Clinic from July 9, 2014, shows that the claimant had an Al C of 7.4%, which indicates that her goal was met. Exhibit B12F. At a follow-up visit to the endocrinology clinic at Vanderbilt University Medical Center on September 16, 2014, it was noted that the claimant had stopped using the Bolus Wizard feature, and she was advised to start using it again. Exhibit B7F. There is no further evidence of treatment for any diabetes-related complications.

In addition to diabetes, the claimant has also been diagnosed with osteoarthritis. During a treatment visit to The Berry Clinic on April 25, 2013, she complained of right elbow pain. Exhibit B13F. However, X-rays of her right elbow taken on August 22, 2013, showed only a possible old healed fracture and no acute fracture, malalignment, joint effusion, or arthritic changes. On the same day, X-rays of the claimant's ankles were taken which showed only minor arthritic changes in both ankles and some old posttraumatic changes in the distal end of the left tibia. Exhibit B4F. During a visit to The Berry Clinic on December 30, 2014, the claimant complained of swelling and pain in her ankles, but no examination findings were noted. Exhibit B13F. Otherwise, there is no evidence of any significant complaints regarding the claimant's ankles.

The claimant has also been diagnosed with coronary artery disease. On February 5, 2014, she presented to Waverly Medical Center for treatment of skin lesions and tachycardia. Aside from some lesions on her legs, she had an unremarkable examination with findings of normal strength, normal gait, intact sensation, and normal ranges of motion throughout. Additionally, it was noted that she had appropriate mood and affect, good insight, intact memory, and intact higher cognitive functions. Her skin lesions were attributed to her history of extensive sun exposure, but there was concern about her chronic tachycardia and persistently elevated blood pressure, and an EKG showed evidence of an old anteroseptal infarct. The claimant was therefore referred to a cardiologist for further evaluation. Exhibit B3F.

Several days later, the claimant was admitted to Central Tennessee Hospital from February 19, 2014, through February 20, 2014, for chest pain. A cardiac catheterization showed normal coronaries, and it was noted that there was very low clinical suspicion for a pulmonary embolism and that the claimant's chest pain was likely related to anxiety or musculoskeletal pain. Exhibit B2F. Additionally, on February 19, 2014, the claimant had an unremarkable echocardiogram although there was evidence of aortic and mitral sclerosis. Exhibit B9F. However, during a treatment visit to Dickson Medical Associates on February 26, 2014, the claimant was diagnosed with chronic diastolic heart failure, and it was noted that she had moderate to severe exertional symptoms and that her heart failure fell into class three under the New York Heart Associate classification system, indicating marked limitations in her physical activity.

5

Two months later on April 20, 2014, the claimant was treated in the emergency room for chest pain, but she had a normal chest X-ray. Exhibit B4F.

On May 23, 2014, the claimant was seen at Vanderbilt Heart. She reported having chronic low back pain with associated lower extremity sciatica that worsened with sitting and prolonged standing, chronic intermittent chest pain that occurred four or five times a week, and a history of depression and anxiety. She reported that her depression had worsened over the past several months with associated symptoms of mood lability and poor sleep. It was also noted that the claimant had a history of iron-deficiency anemia. However, aside from findings of decreased vibratory sensation in her toes (discussed above) and elevated blood pressure, she had an unremarkable examination including a finding of normal heart rate and rhythm. Exhibit B7F.

A subsequent treatment note from Dickson Medical Associates from July 8, 2014, shows that the claimant was diagnosed with coronary artery disease of the native artery, but it was noted that this impairment was stable. Exhibit B5F. There is no evidence that the claimant had any worsening of her coronary artery disease or heart failure prior to the date last insured.

As for the claimant's mental impairment, during a visit to Vanderbilt Heart on May 23, 2014, she was diagnosed with depressive disorder, and it was noted that she had significant depressive symptoms and needed treatment. Exhibit B7F. However, there is no evidence of any mental health treatment.

On December 22, 2014, the claimant underwent a psychological consultative evaluation with Dr. Katie Price-Verdell. She reported that she had last worked as a teacher for Woodstock Middle School in 2009. She stated that she worked there for eleven years but stopped in 2009 because her mother had become sick and "'things just got to be overwhelming'." She also denied ever being fired from job or asked to resign. However, Dr. Price-Verdell noted that supporting documentation had shown that the claimant had been fired from her teaching position due to her history of arrests as she had been arrested twice in 2009 and twice in 2011 for DUI. The claimant complained of depression, anxiety, and obsessive-compulsive behaviors that included washing her hands fifty times a day and always making sure that things were turned off. She also reported feeling restless and agitated at times, and she mentioned that her daughter had been in the custody of her grandmother since 2011 after being placed there by the Department of Children's Services. On evaluation, the claimant demonstrated a normal ability to sustain attention and concentration, maintained appropriate eye contact, and exhibited average insight and a euthymic affect. However, it was noted that she was at times tearful and sad. Based on her overall evaluation, Dr. Price-Verdell, diagnosed the claimant with recurrent, mild major depressive disorder, other specified personality disorder, and alcohol use in sustained remission and assessed a "rule out" diagnosis of obsessive-compulsive disorder. She opined that the claimant had no limitations in her ability to understand

6

and remember, mild limitations in her ability to interact with others and adapt, and no to moderate limitations in her ability to sustain concentration and persistence.

Remaining medical records are dated after the date last insured.

(Tr. 16-18).

## III. CONCLUSIONS OF LAW

### A. Standard of Review

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the Commissioner's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387 (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "This is so because there is a 'zone of choice' within which the Commissioner

can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (citations omitted). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller,* 811 F.3d at 833 (citation and internal quotation marks omitted).

## B. Administrative Proceedings

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("[T]he claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act, as described by the Sixth Circuit as follows:

> (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

8

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The Social Security Administration can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). The grids otherwise only function as a guide to the disability determination. *Wright*, 321 F.3d at 615-16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE") testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the Commissioner must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

9

## C. Claims of Error

**1. The ALJ erred by failing to consider other severe impairments and by failing to provide sufficient reasons for not finding these impairments to be severe.**

Plaintiff argues that, in addition to the impairments that the ALJ found to be severe, Plaintiff was also diagnosed with generalized anxiety disorder, old posttraumatic change of the bilateral ankles, neuropathy, other specified personality disorder, lumbago, and stress incontinence, but that the ALJ failed to give sufficient reasons for not finding these impairments to be severe. (Docket Entry No. 13, at 2, 5).[4] Plaintiff asserts that these impairments "cause more than a slight abnormality on the Plaintiff's ability to function." *Id*. at 6.

At step two of the sequential evaluation process, a plaintiff bears the burden of showing that a medically determinable impairment is severe and meets the twelve month durational requirement of the Act. *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-04 (6th Cir. 2012). Symptoms alone cannot constitute a "medically determinable impairment." SSR 96-4p, 1996 WL 374187, at *2 (S.S.A. July 2, 1996); *see id.* at *1 ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment."). A "severe impairment" is "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to

---

[4]In her brief, Plaintiff does not specify which impairments the ALJ allegedly failed to consider and give reasons for not finding such impairments severe. Plaintiff only refers to "the impairments listed above." (Docket Entry No. 13, at 6). The Magistrate Judge assumes Plaintiff is referring to page 2 of her brief, stating "records show assessments of generalized anxiety disorder, old posttraumatic change of the bilateral ankles, neuropathy, other specified personality disorder, lumbago, and stress incontinence." *Id*. at 2. The Magistrate Judge notes that Plaintiff's citation to the transcript pages ("R. pp. 286, 302, 382, 395, & 429) do not support this statement.

10

do basic work activities." 20 C.F.R. § 404.1520(c).[5] The Sixth Circuit has described the severity determination as "a *de minimis* hurdle in the disability determination process," in which "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The goal of this test is to screen out groundless claims. *Id.* at 863.

However, a diagnosis alone does not establish an impairment's severity. *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of . . . impairments . . . does not establish that [the plaintiff] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs*, 880 F.2d at 863 ("[M]ere diagnosis of arthritis . . . says nothing about the severity of the condition."); *Asbury v. Comm'r of Soc. Sec.*, No. 14-CV-13339, 2016 WL 739658, at *3 (E.D. Mich. Feb. 25, 2016) ("[D]iagnoses themselves generally do not establish disability; rather, disability is determined by the functional impairments caused by the diagnosis or condition. . . . And a diagnosis of a condition, without more, does not speak to the severity of the condition or the functional limitations associated with it."). "'In considering whether a claimant has a severe impairment, an ALJ must not accept unsupported medical opinions or a claimant's subjective complaints.'" *Wilkins v. Comm'r of Soc. Sec.*, No. 13-12425, 2014 WL 2061156, at *13 (E.D. Mich. May 19, 2014) (citations omitted). "[I]t is [the plaintiff's] burden to prove the severity of her impairments." *Higgs*, 880 F.2d at 863 (citing *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir.1986)).

---

[5]Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 CFR § 404.1521(b) (2015).

11

The Magistrate Judge notes that Plaintiff's argument is undeveloped and that Plaintiff fails to cite any evidence in the record that demonstrates that such additional impairments had or will have any impact on her ability to perform basic work activities. Further, the ALJ essentially considered these impairments over the course of the ALJ's decision. The ALJ noted: (1) that Plaintiff had no limitations in her ability to understand , remember , or apply information, interact with others, and adapt or manage herself; was diagnosed with mild major depressive disorder and other specified personality disorder; and there was no evidence of any mental health treatment (Tr. 14, 18, 20, 199-206, 396-98); (2) that medical records showed that Plaintiff "had consistently normal examinations with findings of normal strength, normal gait, intact sensation, and normal mood and affect despite her complaints of . . . back pain," (Tr. 16, 284, 486, 490, 493, 507); (3) that Plaintiff complained of neuropathy in her feet, but "aside from findings of decreased vibratory sensation in her toes . . . she had an unremarkable examination," (Tr. 16,17, 386); (4) that x-rays of Plaintiff's ankles "showed only minor arthritic changes in both ankles and some old posttraumatic changes in the distal end of the left tibia. . . . Otherwise, there is no evidence of any significant complaints regarding the claimant's ankles," (Tr. 17, 298); and (5) that treatment records showed incontinence as being an active problem only after the date last insured, treatment records for the period prior to the date last insured only showed that Plaintiff had a history of urinary incontinence, and that she reported having an overactive bladder but denied having incontinence (Tr. 12-13, 281, 287, 348-360, 377, 383-84, 422-430).

Further, the regulations do not require that all diagnosed impairments be scrutinized for their severity, much less that any such scrutiny be made explicit in the ALJ's decision. The Sixth Circuit has stated, "[W]e do not require an ALJ to discuss every piece of evidence in the record to substantiate the ALJ's decision." *Conner v. Comm'r of Soc. Sec.*, 658 Fed.Appx. 248, 254 (6th Cir.

12

Case 3:18-cv-00366   Document 18   Filed 04/01/19   Page 12 of 19 PageID #: 669

2016) (internal citation omitted). Moreover, an ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error where the ALJ finds that the claimant has at least one severe impairment and proceeds to complete the sequential evaluation process. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Also, the fact that some of a claimant's diagnosed impairments may go unmentioned at the step two severity determination is "legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Here, the ALJ found that Plaintiff suffered from the following severe impairments: diabetes mellitus; osteoarthritis; sciatica; depression; hypertension; anemia; coronary artery disease of native vessel; and chronic diastolic heart failure. (Tr. 12). Because the ALJ specifically found that Plaintiff had at least one severe impairment and completed the sequential evaluation process, the ALJ's alleged failure to find Plaintiff's additional impairments to be "severe" cannot constitute grounds for reversal. *See Maziarz*, 837 F.2d at 244; *Gordon v. Colvin*, No. 3:15-00080, 2016 WL 3137728, at *12 (M.D. Tenn. June 6, 2016), *report and recommendation adopted*, No. 3:15-CV-00080, 2016 WL 3460233 (M.D. Tenn. June 24, 2016). Accordingly, Plaintiff's claim is without merit.

**2. The ALJ erred by failing to properly consider the opinion of Ken Berry, Plaintiff's treating physician.**

Plaintiff contends that the ALJ did not provide "good reasons" for rejecting Dr. Berry's opinion and "did not properly consider Dr. Berry's opinion based on the record as a whole." (Docket Entry No. 13, at 8). Plaintiff contends that "the ALJ failed to cite the specific records which do not support [Dr. Berry's] opinion and also failed to acknowledge records which do support the opinion." *Id*.

Social Security regulations address three classifications of medical sources: treating sources; examining but non-treating sources; and non-examining sources. 20 C.F.R. § 404. 1527; 20 C.F.R.

13

§ 404.1502.[6] A treating source has a history of medical treatment and an ongoing treatment relationship with the plaintiff consistent with accepted medical practice. *Id*. § 404.1527. An examining non-treating source has examined the plaintiff, but does not have an ongoing treatment relationship. *Id*. A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the plaintiff, but provides a medical or other opinion based upon medical and treatment records. *Id*. The opinion of an examining non-treating source is given greater weight than that from a non-examining source, and an opinion from a treating source is afforded greater weight than an examining non-treating source. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (2)). "[W]hen the physician is a specialist with respect to the medical condition at issue," the specialist's "opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527([c])(5)).

"A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. The treating physician's opinion must be supported by sufficient medical data." *Jones*, 336 F.3d at 477 (citation omitted). Thus, "[i]f the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection." *Id*. The ALJ must give treating-source opinions

---

[6]On January 18, 2017, the Social Security Agency published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017). *See also* 82 Fed. Reg. 15132 (March 27, 2017) (amending and correcting the final rules published at 82 Fed. Reg. 5844). These final rules became effective March 27, 2017, 20 C.F.R. § 404.1527, setting forth the rules for evaluating opinion evidence, both medical and nonmedical, for claims filed before that date. Thus, the Magistrate Judge applies these regulations, as well as any other regulations, in effect at the time of Plaintiff's filing on March 19, 2013. *See* 20 C.F.R. § 404.614 (generally, an application for benefits is deemed filed on the day it is received by an SSA employee).

14

"'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not accord the treating physician's opinion "controlling weight," then the ALJ must weigh the opinion based on a number of factors in 20 C.F.R. §§ 404.1527(c), 416.927(c), including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406. "However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242 (citing SSR 96-2p, 1996 WL 374188, at *4). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017).

The regulations also provide that an ALJ must provide "good reasons" for discounting the weight of a treating source opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406-07 (quoting SSR 96-2p, 1996 WL 374188, at *5). The Sixth Circuit has explained that "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of

15

substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. Failure to comply with the "good reasons" requirement, however, may be deemed harmless error. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). "If an ALJ rejects a treating physician's opinion but gives no reasons for doing so, it is difficult for a reviewing court to conduct its own analysis and make a judgment as to what the ALJ's reasons would have been-unless . . . the treating physician's opinion is 'so patently deficient that the Commissioner could not possibly credit it.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657 (6th Cir. 2009)) (quoting *Wilson*, 378 F.3d at 547); *Watters v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 423 (6th Cir. 2013).

On September 30, 2016, Dr. Berry completed a medical source statement ("MSS") and opined that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, sit for thirty minutes at a time for a total of three hours, and stand and walk for fifteen minutes at a time for a total of less than two hours. (Tr. 563). Dr. Berry opined that Plaintiff would need to lie down one to five times during an eight hour shift. *Id*. Dr. Berry noted that these limitations were because of severe degenerative joint disease in multiple joints and incontinence. (Tr. 564). As to postural activities, Dr. Berry opined that Plaintiff could twist, stoop, crouch, and climb stairs occasionally, but never climb ladders. *Id.* Plaintiff could occasionally reach and push/pull and frequently handle, finger, and peel. *Id*. Environmental restrictions included avoiding moderate exposure to extreme cold and heat; avoiding concentrated exposure to soldering fluxes, solvents/cleaners and chemicals; and no restrictions to high humidity, fumes, odors, dust, gases, and perfumes. *Id*. Plaintiff would miss work more than four days per month. (Tr. 565). After the administrative hearing, Plaintiff resubmitted Dr. Berry's opinion with an additional statement that the limitations began in December 2012 to present. (Tr. 20, 38, 62, 568).

16

The ALJ determined that Dr. Berry's opinion should be given very little weight, stating:

> Dr. Berry of The Berry Clinic completed a medical source statement on September 30, 2016, nearly two years after the date last insured, reflecting limitations that would not allow for the performance of full-time work activity. In this assessment, he left blank the section asking about the date on which the opined limitations were first present. Exhibit B14F. However, after the hearing, the same exact medical source statement was submitted by the claimant's representative with the onset date section filled in with "12/2012 -present" in printed handwriting that is different from the handwriting in the rest of the assessment. Exhibit B15F. For this reason, the noted onset date is questionable. Nevertheless, the extreme limitations assessed by Dr. Berry are not consistent with his own treatment records or with other objective medical evidence. His assessments are therefore given very little weight.

(Tr. 19-20).

The ALJ is not required to reiterate the prior paragraphs in support of each conclusion. *See Crum v. Comm'r of Soc. Sec.*, No. 15-3244, 2016 WL 4578357, at *7 (6th Cir. Sept. 2, 2016) ("Elsewhere in her decision, the ALJ laid out in detail the treatment records that showed that Crum could return to normal work activity. . . . No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)). In assessing the medical record, the ALJ noted that the medical records from Dr. Berry dated from February 11, 2013, through December 30, 2014, showed that Plaintiff "had consistently normal examinations with findings of normal strength, normal gait, intact sensation, and normal mood and affect despite her complaints of nerve pain, uncontrolled diabetes mellitus, back pain, fatigue, and headaches;" that while she had some elevated blood pressure readings, Plaintiff "otherwise [had] normal cardiovascular examinations;" and that while she claimed severe neck pain on December 4, 2014, "she had a normal cervical MRI on December 15, 2014." (Tr. 16, 463-562). The ALJ also noted that lab work from Dr. Berry's clinic showed that

17

Plaintiff had an A1C[7] of 7.4% that reflected that she met her goal. (Tr. 16, 444). The ALJ further noted that on August 22, 2103, x-rays of Plaintiff's right elbow "showed only a possible old healed fracture and no acute fracture, malalignment, joint effusion, or arthritic changes," and that x-rays of Plaintiff's ankles "showed only minor arthritic changes in both ankles and some old posttraumatic changes in the distal end of the left tibia." (Tr. 16-17, 298). The ALJ noted that during a visit to Dr. Berry's clinic on December 30, 2014, Plaintiff complained of swelling and pain in her ankles, but there were no examination findings noted and that there was no other evidence of any significant complaints regarding Plaintiff's ankles. (Tr. 17, 514-15). Finally, in concluding that the medical records did not fully support the level of limitation Plaintiff alleged, the ALJ again cited Plaintiff's x-rays of her ankles that showed only minor arthritic changes, which therefore did not support her allegation of moderate arthritis, and while noting that records from Dr. Berry's clinic reflected some complaints of fatigue and headaches, there was no evidence that these were persistent symptoms throughout the period in question. (Tr. 19). Plaintiff does not cite to any medical records that refute the ALJ's summary of Dr. Berry's medical findings or the ALJ's conclusions derived therefrom or to any other medical records that support Dr. Berry's opinion in the MSS.

Based upon a review of the record, the Magistrate Judge concludes that the ALJ properly evaluated Dr. Berry's opinion, gave good reasons for discounting Dr. Berry's opinion, and those reasons are supported by substantial evidence. Accordingly, Plaintiff's claim of error is without merit.

---

[7] "The A1C test result reflects [a person's] average blood sugar level for the past two to three months. Specifically, the A1C test measures what percentage of [a person's] hemoglobin-- a protein in red blood cells that carries oxygen --is coated with sugar (glycated). The higher [a person's] A1C level, the poorer [the person's] blood sugar control and the higher [the person's] risk of diabetes complications." https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643

## IV. CONCLUSION AND RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be **DENIED**, and the Commissioner's decision be **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 1st day of April, 2019.

/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge